**PREMIER MACHINE CO., Inc., v. FREEMAN.**

No. 3103.

Circuit Court of Appeals, First Circuit.

June 3, 1936.

George P. Dike, of Boston, Mass. (Cedric W. Porter, of Boston, Mass., on the brief), for appellant.

Marston Allen, of Cincinnati, Ohio (Nathan Heard, of Boston, Mass., on the brief), for appellee.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

MORTON, Circuit Judge.

This is a suit for the infringement of United States patent to Freeman, No. 1,681,033, dated August 14, 1928 (application filed December 3, 1923), for a cut-out machine for shoe uppers and for certain dies, anvils, and masks used in such machines. The defense is invalidity; infringement being conceded if the claims in suit are valid. In the District Court, there was a decree for the plaintiff on all the claims in suit, and the defendant has appealed. We shall refer to the parties, plaintiff and defendant, as they appeared in the court below.

The patent in question relates to the art of making shoes. In recent years the uppers of women's shoes have, for purposes of style, been ornamented with perforations or "cut-outs," i. e., holes through both the leather and the lining of the upper. The popular style for this ornamentation appears to have started about 1920, although perforations had been used in a small way before that time. The perforations are of various shapes and sizes. The mechanical problem was to cut them cleanly through the leather and the lining of the upper. For shoes to be sold at popular prices, it was necessary that the work be done by machine, which involved the use of dies. The method of cutting holes in leather by means of dies was old and well known long before Freeman entered the field. The cutting might be done either before or after the upper was "closed," i. e., sewed together at the back. In the former case the upper would lie flat and the cutting could be, and had been, done by means of a flat die of any desired size used in a Knight machine. A closed upper on the other hand would not

lie flat except over a limited area, and if laid on a large flat die would bunch up between the die and the striking plate. Material to be cut by a die had, of course, to be held flat upon it when the cut was made.

Freeman seems to have been the first person to conceive the idea, or devise the process, of sewing (or cementing) the lining to the upper, closing the upper so as to bring the leather and the lining into true relation with each other, and then die-cutting the desired perforations through both leather and lining at the same time. This is substantially the way in which the Freeman invention is described in the plaintiff's brief, where it is said: "It (the Freeman invention) shows a result substantially distinct in nature, namely a cutting through of the upper when made up (i. e., closed) and with the lining in place in one blow, which from an art point of view was regarded as distinctly new, and a boon to the industry, and which had most remarkable results and impressed those in the industry as a new art. There was a distinct change in mode of application, namely, the material used was assembled first and cut afterwards" etc. In order to hold the lining in place, to prevent it from raveling when the shoe was worn, and to give the perforations a neat appearance, it was desirable that the leather and the lining should be sewed together around the perforations. This sewing might be done either before or after the perforations had been made. If the sewing was done first, the dies had to be accurately centered on the sewed pattern when the perforation was made, so as not to cut the sewing.

Freeman first devised his method or process, as above stated. He then made the machine of the patent in suit to carry out the process. It must be kept in mind that this suit does not involve the advantage or patentability of the Freeman process, which raises very different questions, but only the patentability of the machine itself from a purely mechanical point of view. The prior art shows dies of many kinds, including those used for making perforations in uppers, and also well-organized machines in which such dies were used. The Newton machine patented in 1922 (on an application filed in 1920) is described as, "a machine for perforating vamps," and the patent further says, "In the manufacture of boots and shoes, it is usual to ornament certain parts of the upper by punching designs therein by means of a gang punch. When it is desired to use a pattern punch to ornament some shoe parts, as the toe portion of a vamp on (or) a wing tip," etc. It further says, "With this object in view, there is provided in the illustrated machines, in combination, a cutting block, a perforating die for ornamenting a vamp and a vamp support connected to the die and movable with respect to the cutting block to carry the vamp from a vamp positioning to a vamp perforating position" (p. 1, line 55 et seq.). The patent to Furber, dated 1923 (application filed 1920), represents another machine for making ornamental perforations in tips and uppers of shoes; and the patent to Whitcomb, dated 1922 (application filed 1920), shows mechanism for accurately positioning a vamp which is to be punched in making ornamental designs. Other similar machines are shown in the record. It is entirely clear that the art of perforating uppers for decorative purposes by the use of punches (or dies) used in machines was old and well developed when Freeman entered the field.

Freeman's dies and method were first used in an old Knight machine on open uppers. The dies adapted to that machine were too large to be used successfully on closed uppers which would not lie flat over so large an area. The use of small dies in the Knight machine was impractical, because the die was supported by the side frames of the machine and the upper could not therefore be draped around it. For these reasons the Knight machine could not be satisfactorily used on closed uppers except in a limited way. Closed uppers and completed shoes had, however, been worked on for many years in making and repairing shoes. Shoe-jacks or other supports, small enough to be introduced into a closed upper or completed shoe and mounted on a shank around which the shoe could be "draped," had long been used to hold shoes while they were being made or repaired. It was perfectly well known in the art at that time that, in working on a finished shoe, a small support or anvil adapted to go into the shoe was used, held on a column around which the shoe was "draped." In the Wright machine patented in 1894 a support in a form approximating a shoe-jack having a flat upper surface of small area was used as an anvil to support a "die" (so called in the patent) used to punch patterned holes in completed uppers. This machine had a columnar support with a flat top carrying a small die, around which the upper was draped.

In the Freeman machine a columnar support carries a die small enough so that a closed upper will lie flat on it over the area to be perforated. This combination of a small die on a columnar support constitute what is claimed to be the basic invention of the Freeman patent; and it is what is covered by the first group of claims. Freeman also made alleged improvements in dies and masks and in a slide for moving the die in and out which will be described in connection with the claims relating to them.

The patent contains 94 claims of which 26 are in suit. They have been discussed by the parties in three groups: (1) Those involving the "anvil die" so called; (2) those involving the "mask"; and (3) those involving the slide for moving the die in and out of the press. It is a convenient grouping, and we shall follow it in our discussion.

In the first group are claims 6, 7, 8, 62, and 71. Of these, claim 6 may be regarded as typical. It reads as follows:

"6. For use in a machine for cutting designs in shoe uppers, the combination including work supporting means, a work cutting unit with upstanding cutting edges mounted thereon, said work supporting means and work cutting unit constructed with a top portion to support in a substantially flat manner a portion of the shoe upper in which a design is to be cut and with lateral sides so shaped that the upper may be draped thereabouts, without buckling the shoe upper while the design is cut therein."

This is a claim of great breadth. As described by the plaintiff's mechanical expert it covers all shoe cutting machines which have an "elevated anvil, having a clearance space, having a flat work supporting surface, and having cutting die mounted on that flat supporting surface or adjacent, with perhaps some means for gauging." So construed, the claim covers every cutting-out machine in which a die is held on a central support around which an upper may be draped; and it is fully and completely anticipated by the Wright machine, supra. Aside from that reference it does not seem to us that the simple arrangement specified in this claim involved invention in view of the prior art. It certainly did not involve invention to reduce the size of the die, so that it could be used in a closed upper or a completed shoe; the District Judge so intimated during the hearings. See Butler v. Steckel, 137 U.S. 21, 11 S.Ct. 25, 34 L.Ed. 582; Anderson & Writer Corporation v. Hanky Beret, Inc. (C.C.A.) 40 F.(2d) 196; Karron v. Karron (C.C.A.) 66 F.(2d) 785; and B. & W. Shoe Machinery Co. v. Multiple B. M. Co. (C.C.A.) 73 F.(2d) 11, at pages 12, 13, where it was said, "changing the size and dimension of dies was a matter of mechanics and did not constitute patentable novelty." Martineau, J. Nor was it invention to provide a support for a small die in such a way that an upper could be draped around it. That very thing had been done for a very similar purpose in the Wright machine. It seems to us to have been clearly obvious in view of the prior art. "It is not a patentable invention to apply old and well-known devices and processes to new uses in other and analogous arts" [Wilson, J., Friend v. Burnham & Morrill Co. (C.C.A.) 55 F.(2d) 150, 153],— much less in the same art. The other claims in this group are somewhat narrower than the sixth, but no attempt has been made in argument to differentiate them. The parties have assumed, we think correctly, that if claim 6 is not good the combinations specified in the related claims do not show anything patentable.

Freeman's basic conception is, we think, accurately stated in the plaintiff's brief, as follows: "Freeman conceived the idea of cutting through the completed shoe upper and lining all at once, by tensioning it over an anvil-like support, which as a unit included cutting edges, and which was proportioned to permit the rest of the upper to be draped and held out of the way." It appears to have been a conception of great value to the shoemaking art. But it is essentially not a mechanical conception at all. Freeman did not invent a new machine, although he did invent improvements in masks. His idea was that the troublesome business of perforating uppers for decorative purposes could, if approached in a different way, be done on existing machines modified slightly for the new use. The testimony of Mr. Riordon, called by the plaintiff as an expert on shoe machinery, supports this view. He said, "I think Freeman conceived an invention, not so much in the way he built a structure, but he conceived a novel idea which had to be present before he made any changes," which amounts to saying that Freeman adapted old mechanism to a new

use. Freeman testified, "What I regard as the novel feature of my patent—and the invention embodied in the patent in suit is the idea of the anvil—was so that you could drape a fitted (closed and lined) upper over it and get the part which you were going to cut out laid flat-wise," etc. In his testimony he tells no story of difficulties encountered and overcome in designing his machine. The first machine was put into commercial use. As soon as the demand for such a machine was recognized various manufacturers proceeded promptly and independently to design and manufacture them.

■ It is strongly pressed upon us that the extraordinary commercial success of the Freeman method furnishes irresistible evidence of the patentability of his machine. The two things are, however, quite distinct. There is in the record only slight evidence of any long recognition of the need for such a machine or of unsuccessful efforts to design one. Commercial success, if shown to be attributable only to the thing patented, may be very significant when the question of invention is close, and especially when there is evidence of previous attempts to solve the problem which were unsuccessful; but it is by no means the equivalent of invention. And when invention is clearly absent it is the duty of the courts to say so no matter what degree of commercial success may have been attained. In Paramount Publix Corporation v. American Tri-Ergon Corporation, 294 U.S. 464, 55 S.Ct. 449, 79 L. Ed. 997, and Altoona Publix Theatres v. American Tri-Ergon Corporation, 294 U. S. 477, 55 S.Ct. 455, 79 L.Ed. 1005, enormous commercial success was held not to be the equivalent of invention.

There is practically no controversy as to the facts on which the question is to be decided. The District Judge apparently did not fully appreciate the extreme simplicity of the arrangement covered in these claims and the consequent wide scope of them; nor did he undertake to discriminate between the different groups of claims or between the Freeman method or process and the mechanism designed to carry it out. We feel obliged to say that in our opinion his conclusion on these claims was clearly wrong.

The legal principles involved have been so recently stated by the Supreme Court in Saranac Automatic Mach. Corporation v. Wirebounds Patents Co., 282 U.S. 704, 51 S.Ct. 232, 75 L.Ed. 634, that no discussion of them is necessary.

■ There is another point which must be noticed in reference to these claims on the machine. On the strength of them the Freeman Company is undertaking to control the manufacture and sale of dies, not permitting any to be used in its machines except those made by its licensees. In practical effect this brings about one-half of all women's shoes now made under the control of this patent. The defendant does not make or use Freeman machines. It makes dies for use in any cutting-out machines including Freeman's. It is sued here for contributory infringement of the first group of claims by selling dies with knowledge that they were to be used in Freeman machines. It is said to be "the only concern who makes anvil dies who is not licensed under the Freeman patent." It is also said in the plaintiff's brief that "at least fifty per cent of the entire women's shoe industry" is carried on by his method. In Jordan Marsh Co. v. Wolff, 80 F.(2d) 314, 315, we said: "When it appears that a patent if established is likely to create a monopoly in a thing in common use, and when the question is whether the forward step taken by the patentee involved invention, it is but just to the public that the patentee establish the presence of invention with a degree of certainty bearing some reasonable relation to the extent and burden of the monopoly which he claims." In Standard Water Systems Co. v. Griscom-Russell Co., 278 F. 703, at page 705 (C.C.A.3), Orr, J., it was said: "The public is interested in every adjudication with respect to the validity of a patent, and it is the duty of courts having jurisdiction of patent causes to have regard, at all times, of the rights of the public, so that such rights may be rather enlarged than diminished by judicial determination. That the public is interested in every patent case is apparent from reading the opinion in Hill v. Wooster, 132 U.S. 693 [694], 10 S.Ct. 228, 33 L.Ed. 502." See, too, Pope Mfg. Co. v. Gormully, 144 U.S. 224, 12 S. Ct. 632, 36 L.Ed. 414.

It seems clear that Freeman's contribution to the art in a mechanical way as described in this group of claims was at best of doubtful patentability and cannot be found to involve invention with such clearness and certainty as is reasonably required in view of the extent and burden of the monopoly claimed.

Freeman v. Altvater, 66 F.(2d) 506 (C. C.A.8), is relied on by the plaintiff as an adjudication of the question of patentability in its favor. We do not so regard it. The defendant there was a licensee under the patent and was estopped from contesting its validity. The court said: "The validity of the patent is not in question, since the defendants, being licensees, are estopped to assert its invalidity." 66 F.(2d) 506, at page 507. The court felt obliged not only to accept the validity of all the claims, but to give them a liberal construction. It said: "We think that it is safe to say that when a licensee, as in this case, seeks to avoid the burdens of his license by endeavoring to make a noninfringing machine, the court will give to the claims of the patent in suit as liberal an interpretation as can be justified."

■ The next group of claims infringement of which is charged are those relating to the "mask," and to the "mask" and the stripper. A die of the type under discussion is essentially a sharp edge formed into the shape and size of the hole to be cut; a number of these, of the same height and of any desired sizes and shapes, may be combined on a single base, and when so combined are referred to as "a die." The dies here in question were of this character. Leather cut with such a die tends to cling to it after the cut is made. In order to free the leather from the die a "stripper plate" so called is sometimes used. It is a thin plate the upper surface of which is normally flush with the tops of the cutters; it is so shaped as to surround the cutters in a loose manner; it is held in position by compressible springs resting on the base. The material to be cut is placed on the stripper and forces the stripper down ahead of it when the cut is made. When the pressure is released the springs of the stripper plate bring it back to its normal position, thereby freeing the material from the die. The die and the stripper were both old; there is no claim that Freeman invented them or the combination of them.

In order to hold the material to be cut firmly on the die and the stripper plate, a flat plate called in the early patents a "clamp" and in the Freeman patent a "mask" was used. It rested on the material and held it against the stripper plate on the top of the die. It was cut out around the cutting edges of the die, so as not to dull or injure them; and it was hinged or anchored to the base of the die or to the support so as to hold the material firmly against lateral movement.

The Freeman "mask" serves as a clamp. It also serves as a gauge by which the material to be cut is positioned with relation to the die. For this purpose there is an opening or "window" in the plate through which the material can be seen. This window is given an irregular shape corresponding to the outline of the stitched pattern of the perforations which are to be made. Its use enables the stitching to be accurately placed with reference to the die, so as not to be cut by the die.

The claims covering the mask feature of the Freeman mechanism appear to be 10 to 18, inclusive, 70, 79, and 81. Some of these claims include the die alone with the mask, and some of them also include the stripper as an additional element. Claims 16 and 81 may be regarded as typical; they read as follows:

"16. A support for shoe upper material to be ornamented, comprising stripping means mounted thereon, and a clamping mask co-operating with said stripping means to hold a portion of shoe upper material under tension, said mask being provided with an edge portion to partially surround that portion of the upper material to be ornamented, said edge portion being shaped to act as a gauge for the positioning of the material beneath the mask."

"81. In combination, a cutting die provided with cutting edges, and a hold-down plate for the cutting die comprising a flat plate adapted to be pressed against the work, said plate being provided with an opening to surround the cutting edges of the die, one edge of said opening being arranged to act as a gauge for the positioning of a piece of work beneath the hold-down."

Several prior patents relating to shoe machinery show clamps which were also adapted to act as a gauge. In the Stanbon patent dated 1922 (application filed in 1919) and in the Whitcomb patent dated 1922 (application filed February 1920) a clamp plate was used in connection with a bar attached to it to hold and position uppers which were being punched or perforated for ornamental purposes by the machine. In the Stanbon machine prick marks were previously made on the vamp which when brought into alignment with

the gauge bar on the clamp positioned the vamp (or upper) for punching. The same method was used in the Lauterschlager patent of 1922 (application filed 1921) in which the gauge bar was curved and also acted as a clamp. In the Furber patent dated 1923 (application filed 1920) a clamp was used to hold down leather which was to be cut; the clamp appears, although not very clearly, to have had a window in it; but if so the window was not used for gauging purposes.

Nothing in the prior art shows Freeman's conception of a clamp plate having a window of a shape and size corresponding to the pattern of the decorations which were to be perforated. His improvement obviated the necessity of placing special gauge marks on the uppers; and we do not doubt that his window, inclosing the pattern and corresponding with it in size and shape, made accurate positioning of the work easier and quicker.

As we understand the plaintiff's brief it does not really attempt to support the mask claims with any greater breadth than we have just indicated. If given greater breadth they are invalid. The plaintiff's contention is that the word "shaped" in claim 16 and in other claims in which it is used, should be construed to limit them as above stated. In some of these claims the expression, "partially surround that portion of the upper material to be ornamented," appears as a further description of the window. It will be necessary to consider separately the claims in this group. Those covering a clamp plate or mask having a fixed relation to the die and having a window the outline of which is similar to the pattern to be perforated, and which is so placed with relation to the pattern and to the die as to be used as a gauge, are, we think, valid. The mere use of a window in the clamp or of a straight curved edge in or connected with the clamp for gauging purposes did not involve invention in view of the prior art.

Applying these principles, claims 10 to 17, inclusive, are not good; claim 18 is good; claim 70 specifies a clamp plate "provided with an opening through which the work may be observed and accurately positioned with respect to the cutting edges of the die." Construing this as referring to an opening so conforming to the size, shape, and position of the ornamentation and so located with respect to them that it serves as a gauge this claim is valid; claim 79 contains nothing patentable over the prior art and is invalid; claim 81 specifies a clamp plate with "an opening to surround the cutting edges of the die, one edge" of which is "arranged to act as a gauge." Construing this to mean that the shape of the opening conforms to the pattern of the ornamentations and that one edge of it is so shaped and located with respect to them as to serve as a gauge, it is valid.

The last group of claims in suit are those relating to a center guide or slide for moving the die horizontally into and out of operating position. The die is pulled out while the work is placed in position upon it; and it is then pushed back into the press and the machine is operated. Claim 67 may be taken as typical of this group, which include claims 62, 65 to 69, inclusive, and 94.

"67. In a machine for cutting out open-work portions of shoe uppers, a movable anvil provided at its upper portion with one or more cutting members having upstanding cutting edges, and at its base portion guiding means located substantially centrally of the anvil and adapted to cooperate with complemental guiding means associated with an anvil supporting bed to guide the movement of the anvil as it is transferred from a work placing position to a work cutting position."

All these claims are clearly invalid. The movable die or anvil sliding in and out on guides in the body of the machine was old and perfectly well known in dieing machinery at that time. Its presence involved no inventive readjustment or modification of the machine and adds nothing to the claims in which it occurs. In the Newton patent, supra, it is said in the specifications "the vamp is first placed in the desired position on a carrier while it is free and clear of the cutting block. The vamp carrier and the die are secured together, and, when the vamp is positioned, all these members are moved rearwardly to a punching position" (p. 2, line 25 et seq.). Substantially the same arrangement is shown in the Whitcomb patent, supra, and very clearly in the old McGemmess and Tweedie patent of 1888. It is not necessary to multiply references. There is no doubt that the idea underlying these claims was old and unpatentable. And there is nothing involving invention in the combination in which Freeman used it.

The decree of the District Court is vacated, and the case is remanded to that court for further proceedings, not inconsistent with this opinion, with costs to the appellant.