### GROSJEAN et al. v. PANTHER–PANCO RUBBER CO., Inc.
#### No. 4454.

District Court, D. Massachusetts.
Jan. 31, 1939.

A. L. Ely, of Akron, Ohio, and Edgar H. Kent, Robert L. Thompson and Roberts, Cushman & Woodberry, all of Boston, Mass., for plaintiffs.

Melvin R. Jenney and Fish, Hildreth, Cary & Jenney, all of Boston, Mass., for defendant.

McLELLAN, District Judge.

This suit involves alleged infringement of four patents, United States Patents Nos. 1,344,503, 1,344,504, 1,650,511 and 1,687,441, all issued to James E. Grosjean. It involves, too, alleged infringement of United States Trade Mark Registrations Nos. 149,142 and 285,219. Unfair competition is also charged. In its answer, the defendant asserts non-infringement and invalidity of the various patents in suit. It also avers non-infringement of the plaintiffs' trade marks and denies unfair competition.

The individual plaintiffs named originally included James E. Grosjean of Lima, Ohio, the patentee of all the patents in suit, Pearl G. Maire and Fred W. Cook, both of Lima, Ohio, alleged owners of fractional parts of the patents by assignment, and the Lima Cord Sole & Heel Company, an Ohio corporation having its office and principal place of business at Lima, Ohio, exclusive licensee under the patents in suit. Title to the various patents as alleged has been admitted by stipulation of counsel. Nannie A. Grosjean and Pearl G. Maire were substituted upon motion as executrices of James E. Grosjean, who died aft-

er suit brought. The defendant is a Massachusetts corporation, having a principal place of business in Chelsea, Massachusetts.

Patents Nos. 1,344,503 and 1,344,504

These two patents were granted together on June 22, 1920, upon applications filed May 15, 1918. No. 1,344,503 is for a method of manufacturing composite soles for boots and shoes. No. 1,344,504 covers a sole manufactured according to the method disclosed in the first patent.

In the manufacture of a sole according to these patents, a relatively thin and substantially flat base is first produced. The base conforms in outline to the proposed finished sole. It is made of some material which admits of vulcanization, preferably canvas thoroughly impregnated with rubber. A tread portion is produced separately from the base, composed principally of a textile material whose threads are presented endwise to the tread surface. This material is thoroughly impregnated with a vulcanizable compound. This tread is initially secured to the base by means of some adhesive material, preferably suitable cement, in the position which it is eventually to occupy in the completed sole. A marginal supporting strip of vulcanizable material, preferably rubber, is then added. This strip, also, is secured to the projecting portion of the base by cement or other adhesive material. The sole is then vulcanized, the pressure employed being preferably exceptionally heavy, so that the tread portion and the marginal supporting strip are both firmly united to the base and to each other.

Claims 1 and 2 of Patent No. 1,344,503 are in suit. These claims read:

"1. The method of manufacturing composite soles for boots and shoes which consists in producing a substantially flat, relatively thin, flexible base, disposing thereon an originally separate tread portion having components of textile material, the ends of whose threads are presented to the tread surface, applying to said base and tread portion a marginal strip of vulcanizable material within which said tread portion is arranged and vulcanizing said base, tread portion and marginal strip under heavy pressure in their assembled relation whereby said tread portion and strip are bonded to one another and to said base.

"2. The method of manufacturing composite soles for boots or shoes which consists in producing a substantially flat, relatively thin, flexible base, disposing thereon an originally separate tread portion of less area and having components of textile material, the ends of whose threads are presented to the tread surface, and arranging said tread portion projecting therefrom, applying to the marginal portion of said base a strip of vulcanizable material within which said tread portion is arranged, and vulcanizing said base, tread portion and marginal strip under heavy pressure in their assembled relation whereby said tread portion and strip are bonded to one another and to said base."

As heretofore stated, Patent No. 1,344,504 is for a sole produced as described in the method patent. Claim 1, which is the only one in suit, will serve to illustrate the difference between the two patents. It reads:

"1. A sole for boots or shoes having a substantially flat, relatively thin and flexible base, a tread portion secured to the under side of said base and composed of textile fabric and vulcanizable material, both presented to the tread surface, said base being of greater area than the tread portion and the latter being arranged whereby said base has a marginal portion projecting beyond the tread portion, and a supporting strip of vulcanizable material laid on said marginal portion in the plane of said tread portion, the sole being vulcanized whereby the components of the tread portion are permanently bonded to one another and the tread and the supporting strip are bonded to one another and to the base, the union of the supporting strip and the vulcanizable material of the tread portion being homogeneous."

To show lack of novelty or invention as to these patents, the defendant relies principally upon United States Patent No. 695,298 to Foster, and United States Patent No. 1,249,292 to Montgomery.

In the Foster patent, a tread for a shoe is shown in which plugs consisting of rolls of fabric impregnated with rubber are inserted in holes cut from a rubber sole in such a way that the ends of the fabric are presented to the tread, and thereafter vulcanized with the rest of the sole so as to become a part thereof. The plugs preferably do not extend all the way through the sole, thus leaving some rubber between the inside end of the plugs and the inside of the sole.

The Montgomery patent, which shows a tread and the process for making it, was is-

sued December 4, 1917, on an application filed March 13, 1917. James E. Grosjean was assignee of one-half interest therein. The tread as shown is made from fabric taken from old tires, and the patent deals primarily with a method of treating this fabric to form a tread in which the ends of the threads are presented to the surface. The use of such a tread in a shoe sole is also shown in the specification. A rubber sole is shown recessed to receive the tread insert, which forms the entire front portion of the sole, except for a margin of rubber, and the whole is thereafter vulcanized. It was argued that the sole shown in Montgomery was formed by cutting or dieing a hole clear through the unvulcanized sole, into which the tread portion was inserted, thereby intimating that there would be no rubber or other backing to the tread element as shown in Montgomery, and that it remained for Grosjean to supply this obviously desirable feature. From an examination of Figure 2 of the Montgomery patent, as well as from the use therein of the word "recessed", it is clear that this argument is without foundation, and I so find.

The defendant makes a tap, or half sole, by dieing out a piece of unvulcanized rubber to form a margin for the completed tap. Within this margin, a tread composed of rubber impregnated cords, the ends of which are presented to the surface, is inserted. A thin flat piece of unvulcanized rubber, of the same material as the margin, is placed against the back of both insert and margin, and all three pieces are vulcanized together. Since the margin and the backing are of the same material, they are joined together by vulcanization and become virtually indistinguishable. The finished product thus resembles Montgomery more closely than Grosjean, since in the latter rubber impregnated canvas serves as the backing material.

1. Claims 1 and 2 of Patent No. 1,344,503 and Claim 1 of Patent No. 1,344,-504 are invalid for want of invention. All three elements of the alleged invention are to be found in the completed Montgomery sole. There is the tread portion, of fabric, the ends of which are presented to the surface. There is a margin of rubber, and a backing of rubber, all joined together by vulcanization. That Grosjean makes the margin strip separately from the backing is not a sufficient change to warrant a finding of invention. Nor is the fact that

Grosjean uses rubber impregnated canvas instead of just rubber for a backing sufficient to warrant such a finding. That such a backing would be stronger would, in my opinion, be evident to any skilled rubber worker, and substitution of a superior material at one step does not ordinarily constitute invention. See Walker on Patents, Section 29, and cases there cited.

2. In view of the invalidity of these patents, it may not be necessary to pass directly on the question of infringement. It is, however, noteworthy, as pointed out above, that if Grosjean is distinguishable from Montgomery by his use of a rubber impregnated piece of canvas, instead of just rubber, then the defendant employs the latter construction and does not infringe.

### Patent No. 1,687,441

This patent, granted October 9, 1928, to James E. Grosjean upon an application filed June 26, 1924, describes a tread material for shoes and a method for making it. The patent is directed to soles similar to those considered in the first two patents. In making the tread described in those patents and in another patent, Grosjean United States Patent No. 1,297,834, not now in suit, but which is later referred to, the plaintiff Lima Company purchased a cord tire fabric, in sheet form, previously coated with "friction", which means a first coat of rubber. This material was relatively expensive. It is the object of the present patent to produce a similar tread from a waste product incident to the manufacture of automobile tires known as "friction scrap". Friction scrap consists of trimmings or remnants of cord or fabric stock having the cords thereof impregnated with uncured friction, which here is high grade rubber cement. The assembled cords are covered by a thin coating of uncured rubber. This material could be purchased for a fraction of the cost of cord fabric.

According to the teachings of the patent, a mass of friction scrap, with the cords running promiscuously therein, is first introduced into a machine known as a "cracker". A cracker, well known to the industry, comprises two spaced corrugated rolls operating at different speeds, and ordinarily is used for such operations as tearing apart raw rubber, preparatory to washing out foreign substances. After the mass of friction scrap has been passed through the cracker the space between the rolls is reduced and the sheet resulting from the first operation is again passed

through the cracker rolls. The effect of these operations is to produce a sheet in which the cords, for the most part, extend longitudinally with the sheet. The sheet is then introduced into a calender, having smooth faced spaced rolls running at different speeds. Here the material is reduced to a smooth sheet of the desired thickness. The alignment of the cords therein is further perfected by passage through the calender. After this operation, the resulting sheets are ready to be cut into small strips and reassembled so that the ends of the cords are presented to the surfaces of the sheet. The latter product is used in the making of soles much in the manner described in the two earlier patents in suit.

All three claims of Patent No. 1,687,441 are in suit. They follow:

"1. The method of making a tread surface which comprises subjecting a mass of uncured waste cord or fabric tire stock consisting wholly of uncured friction coated and impregnated cords extending promiscuously therein to a drawing action to rearrange the cords so that most of them are caused to extend in the same direction and to distribute the cords loosely and uniformly while maintaining the cords of substantial length, rolling the resulting product to form it into a smooth sided sheet having most of the cords extending longitudinally thereof, cutting such sheet transversely to form strips, assembling said strips side by side so that most of the cords therein extend in the same direction in all the strips and to form a tread wherein most of the cords are presented endwise to the tread surface, and vulcanizing the assembled strips to bond together elastically the friction coated and impregnated cords composing them and to unite the strips.

"2. A sheet of material of the character described comprising a plurality of strips of material, each strip being composed wholly of waste cord or fabric tire stock and consisting of individual friction coated and impregnated cords of substantial length, the strips being laid side by side and vulcanized together to form the sheet, the cords being distributed uniformly and loosely in each strip so that most of them are presented endwise to a surface of the sheet, and the cords in each strip being bonded together elastically by vulcanization of the friction coating and impregnating them.

"3. A tread for boots and shoes comprising strips each consisting wholly of individual unwoven textile friction coated and impregnated cords of substantial length distributed uniformly and loosely so that they extend mostly in the same direction in each strip, said cords extending across the tread and having the cords therein arranged to extend in a direction substantially normally to the wear surface of the tread and presenting their ends to such surface, the friction coating and impregnating the cords being vulcanized and thereby bonding together elastically the cords in each strip."

The commercial process of the Lima Company corresponds largely but not entirely with the teachings of the patent. The patent says that the method "comprises subjecting a mass of uncured waste cord or fabric tire stock consisting *wholly* (italics added) of uncured friction coated and impregnated cords" etc. In practice the corporate plaintiff's product does not consist *wholly* of such friction coated and impregnated cords. After the material has gone through the cracker the first time and before the second cracking, additional material is introduced. Waste, resulting from later operations, is put back into the stock. At the same time certain chemicals to improve the vulcanization, along with a certain amount of rubber to serve as a "carrier" for these ingredients, is introduced. The new rubber and chemicals amount to about 11% of the entire stock.

The Lima Company constructs soles from the material shown in the patent. In their regular commercial operations, these soles are made by first placing a backing of rubber against a sheet of the material after the cords are on end. Complete soles are then died out in pairs and vulcanized. Thus these soles do not have the rubber margin shown in the soles which are the subject of the earlier patent. Soles constructed in this manner have met with substantial commercial success.

The defendant also manufactures a composition rubber sole in which friction scrap is the basic raw material. The process it employs is similar to the commercial process of the Lima Company, except that its sheets after the final rolling process are pleated instead of being cut into strips. The pleats are about double in width the thickness desired in the finished tread. The material, thus pleated, is then cut in half, across the cords, by feeding it edgewise to a knife, and the surfaces thus produced become the surfaces of the tread

which go on the bottom of the sole. This process, while similar in effect, is materially different from that employed by the Lima Company and described in the patent in suit. It is covered by a separate patent, United States No. 1,935,519, to Quinn.

The defendant also makes or has made soles using cords recovered from worn out tires. These recovered cords are short pieces of cord or string. They are mixed with rubber and other ingredients in a mixing mill and then rolled to form sheets with the cords loosely aligned therein. Thus soles are made in the same manner as from sheets made from friction scrap. The raw material is slightly more expensive, at prices usually prevailing, than friction scrap. The defendant offered evidence of this second process in an effort to show that the Grosjean patent is merely an attempt to monopolize the best source of raw material for this kind of sole.

The defendant does not urge that the Grosjean method or product has been anticipated by any exactly similar method or product. Its contention is that Grosjean merely took the cord-on-end construction, previously patented by himself and others, and made it from a cheaper raw material, subjecting that raw material to various processes, all of them old and well known in the rubber industry, to adapt it to his purposes. It contends that these steps were obvious to any skilled person having a knowledge of the prior art, and that accordingly the patent is invalid for want of invention.

An earlier Grosjean patent, United States No. 1,297,834, granted March 18, 1919, of which mention has been made heretofore, shows a tread for a sole made with regularly arranged fibrous strands presented endwise to the tread surface. United States Patent No. 792,555, to Pratt, also clearly shows the use of cords with ends presented to the tread for use in soles.

In United States Patent No. 1,000,781 granted to Collier in 1911, short lengths of thread are first treated with a thin solution of rubber and then mixed with dough rubber in a mixing mill. The mixture of threads and dough so obtained is then rolled into sheets and the sheets used to form desired articles in the usual manner. In the specification it is stated: "During the rolling of the material into sheets the threads tend to arrange themselves with their lengths in the direction of rolling so that the sheet has less elasticity and great-er tensile strength in this direction than in the transverse direction."

United States Patent No. 1,517,221, to Mead, describes a process for reclaiming rubber materials. Vulcanized rubberized fibrous material is first shredded in some way, as by passing through a cracker. The fibrous material is then separated from the rubber by passing it before a fan. The fibrous material is then devulcanized and dried, and mixed in a mixing mill with such materials as may be desired. It is stated in this patent: "We find, however, that if this material is passed through a calender the calendering operation tends to align the shreds of fibrous material in the direction of the length of the calendered sheet and in cases where it is desirable that the article possess a higher tensile strength in one direction it is desirable to calender the stock in this manner."

It is clear from Collier and Mead that Grosjean was not the first to discover that cords mixed with rubber can be aligned by rolling or calendering in a suitable manner.

Nor was Grosjean the first to conceive of the use of friction scrap for other commercial purposes. United States Patent No. 1,482,952, to Stedman, shows the use of this material in the manufacture of rubber flooring. British Patent No. 21,455 of 1914, to Beldam, shows the use of friction scrap in the manufacture of soles for shoes, although it does not appear that he used them to form a sole with cords on end, such as are here involved.

The patent in suit does not specify exactly what is done to cut the sheets as finally rolled, and reassemble the strips into a sheet in which the ends of the cord are at right angles to the surface. In the plaintiff's process, however, this is done on a machine described in United States Patent No. 1,548,052, granted to Maranville August 4, 1925, on an application filed November 11, 1919. As previously stated, this process is performed by the defendant according to United States Patent No. 1,935,519, to Quinn, in a different way.

The three claims of this patent are invalid. Composition rubber soles having fabric, whose ends are presented to the tread, are shown in Pratt, in Montgomery, and in the earlier Grosjean patent, all heretofore described. A cracker is well known in the rubber industry and commonly employed for work analogous to that here performed. The fact that cords can be loosely aligned by rolling is disclosed in both Col-

lier and Mead. The raw material selected was a well known waste product, to which inventors had previously turned their attention, as shown by the patent to Stedman, and the British patent to Beldam. It thus appears that the present patentee took a known waste product, put it through a series of machines old in the industry, which had previously been used to perform analogous tasks in that industry, and produced as a result a sole similar to one previously patented to himself and others. This is not invention. While it is true that a combination of elements, old in themselves, which unite to form a new and different result may amount to invention (see Diamond Rubber Company v. Consolidated Rubber Tire Company, 220 U.S. 428, 31 S. Ct. 444, 55 L.Ed. 527), this is not such a case. As stated in Premier Machine Company v. Freeman, 1 Cir., 84 F.2d 425, 427: "'It is.not a patentable invention to apply old and well-known devices and processes to new uses in other and analogous arts' (Wilson, J., Friend v. Burnham & Morrill Company [1 Cir.], 55 F.2d 150, 153),— much less in the same art." Under these circumstances the fact that the patented method met with commercial success is immaterial. Paramount Publix Corporation v. American Tri-Ergon Corporation, 294 U.S. 464, 55 S.Ct. 449, 79 L.Ed. 997; Altoona Publix Theatres v. American Tri-Ergon Corporation, 294 U.S. 477, 55 S.Ct. 455, 79 L.Ed. 1005.

In view of the invalidity of this patent, it is not necessary to pass directly on the question of infringement. It may be noteworthy, however, that the patent is a narrow one, limited to a described series of steps, and that all claims are limited to soles made "wholly" from friction scrap. Both parties introduce new · rubber and chemicals into the process, the corporate plaintiff about 11% and the defendant about 10% of the entire stock. At one step, that of turning the cords on end, the defendant employs a method, the Quinn pleating method, which differs materially from that shown in the patent in suit.

United States Patent No. 1,650,511

This patent was granted to James E. Grosjean November 22, 1927, upon an application filed December 9, 1924. It covers a heel for boots and shoes constructed from friction scrap. Hence it is closely related to the sole patent previously considered. Friction scrap is first put through a cracker, and then through a mill having smooth faced rolls in the same manner as shown in the other patent. The material thus prepared is forced through a so-called tube machine, commonly employed in plants producing rubber products, which produces a strip of material, the shape eventually desired for the heel, in which the cords for the most part extend. longitudinally. Sections of this strip are then cut off transversely to the lengths of cord to form the tread for heels. A second piece of the same shape is died out from the sheet of material as it comes from the smooth faced rolls. This piece, in which the cords are parallel to the surfaces, serves as a backing for the tread portion. A margin of rubber compound as is generally used in making rubber heels is placed around these two pieces, and the whole is vulcanized to form a completed heel.

In the specification it is pointed out that the upper piece in such a heel, in which the cords are parallel to the tread, is capable of holding nails, thus dispensing with the need for special washers imbedded in the heel for this purpose. In the evidence, this feature was referred to as an added advantage of the patented construction. It was included in some of the claims as set forth in the original patent application, but was dropped in the patent office and is not mentioned in any of the claims as finally allowed.

Claims 1, 2 and 4 of this patent are in suit. They follow:

"1. A heel for boots and shoes comprising a tread-forming body made from reclaimed uncured tire material and composed of loose textile fibers and friction, most of the fibers extending in the same direction in said body and presenting their ends to the tread surface thereof, the friction being vulcanized and thus uniting the fibers elastically.

"2. A heel for boots and shoes comprising a tread-forming body composed of unwoven textile fibers and high-grade highly elastic rubber, the fibers being distributed loosely through the body but extending mostly in the same direction therein and presenting their ends to the tread surface of the body, the fibers being bonded together elastically by the vulcanized rubber comprised in said body."

"4. A heel for boots and shoes comprising a lower tread-forming body and nother body superposed thereon each of said bodies being composed of unwoven textile threads distributed loosely through the re-

spective body and extending mostly in the same direction therein and high-grade, highly elastic friction bonding together the threads in each body, the tread-forming body having a tread surface formed by the ends of the threads and the friction composing it, the threads in the tread-forming body being elastically connected by the friction therein and thus rendered capable of free movement relatively to one another to conform with compression of said body in the direction of the length of the threads by force applied to the tread surface."

Heels manufactured by the Lima Company and introduced in evidence follow the teachings of this patent with two exceptions. For a backing, where the patent shows a layer of material in which the cords are aligned but run parallel to the tread, the heels actually made have three such layers, two being lengthwise and one crosswise. Some heels are made without the rubber border shown in the specification. Others have this border. It should be noted, however, that a border is not a part of any of the claims in suit. The Lima Company's heels are made both with and without nail holes and washers.

The defendant makes a heel, adduced in evidence, in which there is a tread element, made from friction scrap, the ends being presented to the tread surface, backed by two layers, derived from the same material, in which the cords run parallel to the tread, the cords in one layer being at right angles to the cords in the other. There are no nail holes or washers in this heel.

In addition to those patents cited in connection with the foregoing sole patent, United States Patents Nos. 769,324 and 792,555, both to Pratt, show heels in which tread portions are made from fabric whose ends are presented to the surface of the tread. United States Patent No. 1,439,547, to Grosjean, shows a heel in which fabric portions are used to hold nails. This patent was cited in the patent office before the claims of the present patent relating to nail-holding were deleted.

Because heels with cords on end to form the tread were old, and for reasons sufficiently appearing in the discussion of the sole patent No. 1,687,441, the claims in suit in this patent are invalid for want of invention.

United States Patent No. 1,470,442

As to another patent, United States Patent No. 1,470,442, to Grosjean, included in the bill of complaint, counsel for the plaintiff stated in his opening that the plaintiffs "have withdrawn the action". Accordingly it need not here be considered or discussed.

The Trade Marks

On December 6, 1921, the corporate plaintiff registered as its trade mark the words "GRO CORD", the letters "GRO" appearing above the letters "CORD". The letters are shown in block capitals, made to simulate cord or twine. The words are flanked by two arrows bent to a semi-circle. This is Registration No. 149,142. In the registration it is stated: "no claim being made to the exclusive right to the use of the word "Cord" apart from the mark shown in the drawing."

On July 21, 1931, the Lima Company received registration of another trade mark, numbered 285,219. It consists in part of the words "RAW CORD By GRO CORD". The words "RAW CORD" are in large capitals, and over them is represented a piece of rope or twine. Underneath the words "RAW CORD" appears just the word "By," and underneath that the words "GRO CORD" flanked by two arrows bent in a semi-circle, as in the corporate plaintiff's earlier trade mark. Again it is stated: "no claim being made to the exclusive right to the use of the words 'Raw-Cord' and/or the word 'Cord' apart from the mark shown in the drawing."

I think it unnecessary to determine the validity of these trade marks. Assuming without deciding their validity, the question is that of infringement.

To continue with a statement of the facts bearing on this question: On December 5, 1922, the defendant registered as its trade mark the word "PANCORD" appearing in large capitals. It uses on its products the same word in script. The plaintiffs say in substance that the script is less plain and results in customers confusing the defendant's goods with those of the corporate plaintiff. The defendant says that if it had used large capitals instead of script the plaintiffs would have had more cause for complaint because at least the plaintiff's lettering and the defendant's would have been alike. However this may be, the matter surrounding the corporate plaintiff's trade mark and that of the defendant resemble each other not at all, and in view of the express disclaimers heretofore recited, no infringement appears.

352

The defendant has a trade mark "Bilt-rite" as to which the plaintiffs do not argue seriously that it infringes.

The defendant infringed neither of the corporate plaintiff's trade marks.

### Unfair Competition

■ For a further cause of action the plaintiffs allege that the Lima Company, exclusive licensee under the various patents, has adopted and used certain distinctive and peculiar forms of advertising literature, and has sold its products under distinctive trade marks or trade names, and with distinctive and individual dress and appearance, so that such features have come to be recognized in the trade as peculiar to and identifying its products and goods. It is charged that the defendant, contriving to mislead and deceive the public and deprive the plaintiffs of their lawful trade and good will, and maliciously to secure to itself the benefit of the trade and good will built up by the plaintiffs, and particularly by the corporate plaintiff, has unfairly and unlawfully imitated the dress, display, appearance, advertising and trade names and trade marks of the corporate plaintiff. It is averred that the defendant thereby deceived and misled the public into purchasing its soles and heels and thus injured the plaintiffs.

Seeking to maintain their alleged cause of action for unfair competition, the plaintiffs advert chiefly to the script lettering on the defendant's soles and heels heretofore mentioned, the rope lettering used in some of the defendant's advertising matter, the use by the defendant of the words "cord on end", and isolated instances of confusion between the corporate plaintiff's product and that of the defendant.

The corporate plaintiff manufactured for some years the line of goods of which the various patents in suit are representative. According to the evidence, it enjoyed a monopoly of this business until 1936, when the defendant entered the field. It was contemplated that eventually the soles and heels sold by the parties might be made a part of shoes of the various types for which they were designed.

The Lima Company's soles and heels were marked with the trade marks to which in another connection reference has been made. The defendant's product bore the trade mark "Pancord" in script. The plaintiffs complain that this results in a mark readily confused with that of the corporate plaintiff, but the difference in marking is such as upon inspection to be readily apparent. The fact that in a single instance a merchant interviewed by one of the plaintiff's representatives read "Raw" for "Pan" from a Pancord sole seems to me insufficient to warrant a different conclusion. Such confusion as existed was not due to the trade mark.

The corporate plaintiff used, at times, in connection with its advertising, the words "cord on end". The defendant stamps these words on its soles. The words are descriptive of the construction employed in both soles. They are also descriptive of the construction shown in the Grosjean 1919 patent, No. 1,297,834, which has expired and is not in suit. I am unable to find that the term "cord on end" ever acquired the secondary meaning for which the plaintiffs contend. In other words, I cannot find that the plaintiffs have done more than to show possibly that people have come to associate the corporate plaintiff's product and the name by which it is sometimes known with the Lima Company. It is not shown "that the primary significance of the term in the minds of the consuming public is not the product but the producer."[1]

In some instances shoes equipped with the defendant's soles or heels were returned to the corporate plaintiff with complaints of faulty construction. A part of the evidence to this effect consisted of reports by a salesman not called as a witness, and certain correspondence, both offered under the statute as to business entries, U. S.C., Title 28, Section 695, 28 U.S.C.A. § 695. Assuming the admissibility of all the evidence proferred on this subject, both that which was admitted and that which was excluded as not within the statute, it all shows only isolated cases of confusion such as would naturally result where a new firm enters a field long exclusively occupied by another. By their nature, soles of this type must all look a good deal alike. Such confusion as occurred was due not to any fraudulent marking or deceitful advertising by the defendant, but to the similarity of its products to those of the corporate plaintiff, which, as heretofore found, were not protected by valid patents or infringed trade marks.

■ Except for the trade marks, which here were not infringed, this case has

---

[1] This quotation taken from Kellogg Company v. National Biscuit Company, infra.

much in common with Kellogg Company, Petitioner, v. National Biscuit Company, 305 U.S. 111, 59 S.Ct. 109, 115, 83 L.Ed. ——, decided by the Supreme Court of the United States November 14, 1938, where it was said: "Kellogg Company is undoubtedly sharing in the goodwill of the article known as 'Shredded Wheat'; and thus is sharing in a market which was created by the skill and judgment of plaintiff's predecessor * * *. But that is not unfair. Sharing in the goodwill of an article unprotected by patent or trade-mark is the exercise of a right possessed by all—and in the free exercise of which the consuming public is deeply interested. * * *"

The plaintiffs have not sustained the burden of proof and are entitled to no relief based on the charges of unfair competition.

By reason of the invalidity of the patent claims in suit, the defendant's non-infringement of the corporate plaintiff's trade marks, and the plaintiffs' failure to make out a case of unfair competition, a decree dismissing the bill is to be entered.