25 C.C.P.A. (Patents)

## In re VETTER.
### Patent Appeal No. 3977.

Court of Customs and Patent Appeals.
June 6, 1938.

Arthur Wright, of New York City, for appellant.

R. F. Whitehead, of Washington, D. C. (Howard S. Miller, of Washington, D. C., of counsel), for Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

This is an appeal from a decision of the Board of Appeals of the United States Patent Office affirming a decision of the examiner rejecting all claims of appellant's application for patent entitled "Process of Obtaining Anhydrous Sodium Bichromate and Product Thereof." The claims are numbered 1 to 19, inclusive. Claims 1 to 15, inclusive, are method claims; the others are for the product. At the hearing before us counsel for appellant moved to dismiss the appeal as to claims 1, 4, 7, 10, and 13. This motion will be allowed.

As illustrative of the fourteen claims remaining in the case, we quote the following:

"2. A process which comprises crystallizing anhydrous sodium bichromate from an aqueous solution at a temperature above 83° C. under a sub-atmospheric pressure."

"6. A process which comprises crystallizing anhydrous sodium bichromate from an aqueous solution of dissolved impurities at a temperature of about 90° C. under a sub-atmospheric pressure of 24 to 25" of mercury."

"11. A process which comprises crystallizing anhydrous sodium bichromate from a saturated aqueous solution down to one quarter the volume of the solution at a temperature above 83° C. under a sub-atmospheric pressure."

"14. A process which comprises crystallizing anhydrous sodium bichromate from an aqueous solution of sodium sulphate and sodium chloride at a temperature above 83° C. under a sub-atmospheric pressure, thereby obtaining C. P. anhydrous sodium bichromate."

"16. A granular body of individual separate crystals of anhydrous sodium bichromate without the presence of decomposition products of sodium bichromate."

The references cited are: Caspari, 1,003,875, Sept. 19, 1911; Harms, 1,976,936, Oct. 16, 1934; Ebner, 1,944,548, Jan. 23, 1934; Briscoe, 1,443,616, Jan. 30, 1923; British, 105,222, Jan. 17, 1918; Chemical Abstracts, Vol. 25 (1931) page 4091; Seidell—Solubilities of Inorganic and Organic Compounds, Vol. 1, page 650, Van Nostrand, 1919, Copy in Division 59.

In the statement of the examiner after the appeal to the board is found the following:

"This application is directed to a process of producing anhydrous sodium bichromate. An aqueous solution of sodium bichromate containing dissolved impurities, such as sodium sulphate and chloride, is heated at a temperature above 83°C. and preferably not higher than 90°C. to drive off the water. * * *

"The process is operated under reduced pressure, to increase the efficiency of the evaporating step and to obviate the necessity for heating to higher temperatures."

The patent to Caspari is for a process of making granular sodium bichromate. He starts, according to the specification, "from crystallized bichromate of sodium obtained as small crystals by crystallization in motion, or from some similar form of the water containing salt granulated e. g. by grinding and screening." The substance is dehydrated, by a process described, it being taught that "The dehydration proceeds without any material change of the form of the crystals or of the granules and without any formation of dust."

The patents to Briscoe, Ebner, and Harms show processes of evaporation of various salts by use of a vacuum that is under sub-atmospheric pressure. The patent to Tucker relates to a process for the reclamation and saving of the unused excess of sodium or potassium bichromate from waste liquor baths. It points out that a vacuum evaporator may be used in carrying out the process. Also, it teaches that when the bichromates have been recovered in crystal form, they "may then be further purified by resolution in boiling water and re-cooling, when very pure crystals are obtained."

The publication of Seidell discloses the temperatures, concentrates, and solid phase for two forms of sodium dichromate (which is the same as sodium bichromate). One of these forms contains water of crystallization; the other is the anhydrous form.

The Chemical Abstracts publication contains a paragraph on the purification of technical sodium dichromate in which pure sodium dichromate is obtained in hydrated form by a process of crystallization.

We first consider the product claims.

In the statement of the examiner it is said: "Claims 1 to 19, all the claims, stand rejected on Caspari in view of Seidell for the temperature of crystallization and the other references for the reduced pressure feature."

The product claims, 16 to 19, were also rejected on the Chemical Abstracts publication in view of Seidell, it being said: "Chem. Abstracts discloses a method for obtaining pure dihydrate of $Na_2 Cr_2 O_7$. To dehydrate this product by heating is not patentable, nor by recrystallization at 90° from aqueous solutions in view of Seidell."

The broad statement in the first ground of rejection by the examiner, quoted supra. to the effect that all the claims stand rejected upon Caspari in view of Seidell for the temperature feature, and in view of the other art for the reduced pressure feature might, without an analysis of the remainder of the examiner's decision, leaves the impression that the Caspari patent entered into his rejection of both the method and product claims. Such, however, does not seem to be the case, and this view is confirmed by the statement in the brief of the Solicitor for the Patent Office that "reference to Caspari has not been relied upon as disclosing any features of the *process* claimed." (Italics ours.)

The board approved the rejection of the product claims on the Chemical Abstracts publication in view of the Seidell publication, adding the opinion that Seidell alone is sufficient to anticipate them. It also approved the rejection of them upon the Caspari patent.

Appellant's brief, discussing the product claims, insists that the Seidell publication "says nothing whatsoever about any *crystals* of nor anything about *crystallizing* the anhydrous form," and that nowhere "in the prior art * * * has there been any mention previously of the crystals of this [anhydrous sodium bichromate] compound." As to the Caspari patent, it is argued, in effect, that the anhydrous sodium bichromate produced is not crystalline but amorphous. As to the Chemical Abstracts reference, the brief simply asserts that it "does not show the anhydrous sodium bichromate." It is also argued that the Caspari patent does not disclose a product "without the presence of decomposition products."

It will perhaps aid in understanding the issues respecting all the claims to quote pertinent definitions of certain terms used in some of them and in the foregoing argument. The quotations are from Webster's New International Dictionary:

"Crystal 4. A body formed by the solidification, under favorable conditions, of a chemical element, a compound, or an isomorphous mixture and bounded by plane surfaces symmetrically arranged, which are the external expression of a definite internal structure. * * *

"Amorphous 1. Having no determinate form; of irregular shape * * * specif., of solids, without crystallization in the ultimate texture. * * *

"Anhydrous a. Destitute of water, esp. water of crystallization; as *anhydrous* salts.

"Decomposition 1. * * * separation into components; specif., decay or dissolution."

The chemical formula for anhydrous sodium bichromate (or dichromate) is $Na_2 Cr_2 O_7$.

It is true that the Seidell publication does not make use of either the term "crystals," or the term "crystallizing," and it is conceded in the brief of the Solicitor for the Patent Office that the process of purification disclosed by the Chemical Abstracts publication is one of purifying hydrous, not anhydrous, sodium bichromate. However, both show an ultimate product correspond-

ing to the formula quoted, and it may be remarked that there is nothing in either publication which defines such product as being amorphous.

Whatever bearing the publication references may have upon the product claims at issue, it seems quite clear to us that the teaching of the Caspari patent is sufficient to anticipate them. As has been pointed out, Caspari starts with small water-saturated crystals of sodium bichromate and dehydrates them without causing any material change in the form of the crystals and without the formation of any dust. In connection with the definition of crystal, above quoted from Webster's New International Dictionary, we find the following: "Crystals have the property of growing indefinitely by addition from the outside. The faces often develop unequally, but the angles between them remain constant, and each species has its fixed axial ratio."

The Caspari patent teaches that his process can be modified by adding a solution of sodium bichromate while the material is being dried until the crystals or granules reach the desired size, and it is stated that the product consists of spherical granules free from dust.

It would seem obvious, as argued, in substance, by the Solicitor for the Patent Office, that if there be no change in the form of Caspari's crystals when the hydrous sodium bichromate is dehydrated and becomes anhydrous, the product so resulting is crystalline in form and not amorphous.

With respect to the process claims, it is noted that two general features are present in all of those now before us; viz., (1) the temperatures at which crystallization is carried out—"above" 83°C., "about" 90°C. being specified in some of the claims, and (2) crystallization under a sub-atmospheric pressure, that is by the use of a vacuum.

The examiner declared that the lower temperature limit, 83°C., "is critical since below this temperature the hydrated form is the stable solid phase, the anhydrous form being obtained at temperatures above 83°C." He also said that "The upper limit, 90°C. is preferred because sodium sulphate is less soluble at 90° than at 83°C." It was also stated that the higher limit "is adopted to avoid any danger of decomposition * * *."

After so stating, however, the examiner said:

"Purification of salts by recrystallization is a well known method of purification,

see Briscoe et al. Applicant takes impure dichromate, dissolves it in water, and recrystallizes it, at temperatures above 83°C. It was known that the solid phase in equilibrium with a saturated aqueous solution of sodium dichromate is $Na_2 Cr_2 O_7 2H_2O$ at circa 81°C. and below, and the anhydrous salt at higher temperatures. Seidell is cited as evidence. Therefore to cause the recrystallization to occur above 81 or above 83°C. would be obvious to any competent chemist skilled in the art, where the anhydrous salt is desired.

"Since economy in the heating operation would dictate that no temperature higher than actually necessary be employed, it is obvious to operate in the 90°C. range. It was also known that sodium sulphate is less soluble in hot than in cold water, see any Chemist's Handbook. This would be one more reason for not carrying the temperature during crystallization any higher than necessary to crystallize the anhydrous salt. The upper limit, 90°C. is not particularly critical, sodium dichromate (i. e., bichromate) decomposing at a much higher temperature. It melts at 320°C. and decomposes at 400°C. with the evolution of oxygen."

Touching the feature of crystallizing under a sub-atmospheric pressure (that is by use of a vacuum) the examiner pointed out, with citation of the pertinent references, that evaporation under a vacuum is a common method of evaporation and "is ordinarily employed where evaporation at low temperatures is desired."

In approving the grounds of rejection advanced by the examiner, the board said:

"As to the process, Seidell shows the separation of solid phase sodium bichromate in the anhydrous form at 93°. This sodium bichromate would obviously be presumed to be pure or if not pure, there would be no invention in purifying it before crystallization. Seidell does not give 83° as a lower limit for the separation point of the anhydrous crystals, but we see no patentable invention in the determination of 83° as the lower limit for the separation of the anhydrous form and the same is true of determining 90° as the upper limit.

"The various references in the claims to impurities, as we have indicated, are not critical and are devoid of novelty. Sodium bichromate can be either pure or impure and if in the latter condition, from following the teachings of Seidell and applicant

the anhydrous crystals of sodium bichromate separated out would naturally be pure.

"The use of sub-atmospheric pressures in crystallization is conventional and shown by the British patent."

The prior art clearly teaches the obtaining of pure crystals by crystallizing hydrous sodium bichromate by the same process which appellant applies in producing anhydrous sodium bichromate in crystal form.

In the case of Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464, 473, 55 S.Ct. 449, 453, 79 L.Ed. 997, the court said: "The application of an old process to a new and closely analogous subject-matter, plainly indicated by the prior art as an appropriate subject of the process, is not invention [citing cases]."

In view of the state of the art, as above set forth, we are unable to agree that the process claims of appellant are patentable upon the basis of the general features described, nor do we find any specific limitations in any of them which seem to lend patentability.

The appeal is dismissed as to claims 1, 4, 7, 10, and 13. As to all others, the decision of the Board of Appeals is affirmed.

Affirmed.